## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELYSSA HUBBARD<br>3703 Shoreview Ln<br>Missouri City, TX 77459<br><br>   Plaintiff,<br><br> v.<br><br>HOWARD UNIVERSITY<br>2400 Sixth Street, N.W.<br>Washington, DC 20059<br><br>   Defendant. | Civil Action No. 17-2262 |

## COMPLAINT

COMES NOW, Plaintiff ELYSSA HUBBARD (hereinafter, "Ms. Hubbard" or "Ms. Hubbard"), by and through her attorneys of record, Jason J. Bach, Esq., of The Bach Law Firm, LLC, and Tracy D. Rezvani of The Rezvani Law Firm, LLC, and hereby complains and alleges against the above-named Defendant, based upon knowledge, information, and a reasonable belief derived therefrom, as follows:

## PARTIES

1. Plaintiff ELYSSA HUBBARD is currently a resident of the State of Texas presently residing at the address set forth in the caption hereof, and, at all relevant times, was a student at Howard University.

2. Defendant HOWARD UNIVERSITY (hereinafter, "HU" or the "University") is a private university incorporated by an act of the United States Congress in 1867. HU operates its university at the premises located in Washington, D.C., at the address set forth in the caption hereof.

1

3.     At all times relevant hereto, and in all their actions described herein, Defendant's actions took place in Washington, D.C.

**VENUE & JURISDICTION**

4.     Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (diversity) because the amount in controversy exceeds $75,000.00, and the parties are diverse.

5.     Venue is appropriate in this Court as Defendant is located in this District, and the facts giving rise to this complaint arose in this District.

6.     This Court has personal jurisdiction over Defendant pursuant to D.C. Code § 13-423.  This Court has personal jurisdiction over the parties because, *inter alia*, Defendant is located in the District of Columbia, engaged in the acts directed at Ms. Hubbard in the District of Columbia, conducts substantial business in this jurisdiction, and has extensive, systematic and continuous contacts with this state.

**FACTS**

7.     Ms. Hubbard was a student at HU in the mechanical engineering program and expected to graduate in May 2017.

8.     Ms. Hubbard enrolled in Fluid Mechanics I (hereinafter, "FM I") with Dr. James Hammonds during the fall 2015 semester and had nothing but mid-80s grades going into the final examination; yet, she received a D for the class.  When Ms. Hubbard questioned Dr. Hammonds to challenge her final grade, Dr. Hammonds said she received a D because she only turned in 5 out of 11 homework assignments.  In fact, Ms. Hubbard did turn in all eleven homework assignments in the FM I class, but he claimed he never received them.  As she turned in her only copies of her assignments and did not have proof of delivery to Dr. Hammonds, Ms. Hubbard was forced to accept the D for the class.

///

9.    Ms. Hubbard also enrolled in the FM I lab class with Dr. James Hammonds during the fall 2015 semester.  This lab grade was based on a single assignment completed by Ms. Hubbard and her lab partner that they worked on together equally.  Ms. Hubbard's lab partner received a B for the FM I lab class based upon their joint work assignment while Ms. Hubbard received an F for the lab class.  When questioned by Ms. Hubbard about the grading discrepancy, Dr. Hammonds refused to explain the reasoning for the F grade citing privacy issues and said he could not discuss another student's grade.

10.    Similar issues arose in the spring 2017 semester when Ms. Hubbard was enrolled in Dynamics class (hereinafter, "CRN 11232"), which she took with Dr. Robert E. Efimba.  Dr. Efimba failed to provide structured learning activities to allow Ms. Hubbard to develop the abilities to make meaningful applications and generalization to new problems and contexts.  Dr. Efimba failed to demonstrate specialized knowledge of how to convey and reveal subject matter to Ms. Hubbard and the other students in the class.  Dr. Efimba failed to provide the instruction for which Ms. Hubbard enrolled to receive and for which she dutifully and timely paid for.

11.    The pattern continued with Dr. Hammonds once again when Ms. Hubbard enrolled in his Fluid Mechanics II (hereinafter, "FM II") course during the spring 2017 semester.  Ms. Hubbard received another D grade from Dr. Hammonds in this class despite once again timely completing and turning in all assignments.

12.    In accordance with HU policy, Ms. Hubbard contacted Dr. Hammonds on May 22, 2017, to dispute the D grade she received in FM II.

13.    Dr. Hammonds responded to Ms. Hubbard indicating that her homework grade was zero because she did not turn in any assignments and reminded her that the FM II class syllabus states that homework is 25% of the overall grade for the class.  Dr. Hammonds also indicated that

///

Ms. Hubbard received a 60 on the midterm and a 70 on the final, which count for 35% and 40% of the grade, respectively.

14. On May 24, 2017, in accordance with HU policy, Ms. Hubbard contacted Dr. Nadir Yilmaz, Professor and Chair of the Department of Mechanical Engineering, in order to further pursue the grade dispute. Specifically, Ms. Hubbard alleged that she completed all homework assignments in FM II and this time she had evidence because she submitted them all to Dr. Hammonds via his Howard University email in case they were "lost" again, as they had been in the FM I class.

15. Ms. Hubbard also disputed the grade she received on her mid-term FM II examination. She had spoken to Dr. Hammonds about her grade immediately after the mid-term exam. Dr. Hammonds initially stated that Ms. Hubbard did not provide graphs on the exam, but, when she pointed out that she had provided graphs, he then said she was not given credit because they were not what he wanted. Ms. Hubbard had no way of knowing exactly what type of graphs Dr. Hammonds wanted because he did not provide in his lectures or any handouts detailing examples of what type of graphs he wanted and there was no textbook for the class. Given the lack of direction, Ms. Hubbard and her classmates used any resources they could find. Ms. Hubbard found examples of graphs that were similar to or the same reference materials being used by others in her study group. Ms. Hubbard stated to Dr. Yilmaz that she should be given credit for the work that she did on the mid-term examination given the limited instruction and resources provided by Dr. Hammonds.

16. Dr. Yilmaz acknowledged receipt of Ms. Hubbard's grievance on May 24, 2017, and said he would look into it; he also requested Ms. Hubbard provide exams and any other relevant material which contributes to the overall course grade.

///

17.    Ms. Hubbard submitted to Dr. Yilmaz copies of the FM II mid-term exam and copies of the timely completed and turned in homework assignments.

18.    Dr. Yilmaz acknowledged receipt of Ms. Hubbard's documentation on May 31, 2017, and said he would get back to her.

19.    On June 23, 2017, Dr. Yilmaz informed Ms. Hubbard that he had reviewed her documents, including the homework, but had not received a response from Dr. Hammonds.  At that time, he recommended she file a grievance with the appropriate HU entity.

20.    Ms. Hubbard indicated to Dr. Yilmaz that the Grievance Procedures dictate that all disputes that are not resolved at the departmental level are then brought to the Dean's Office.

21.    On June 26, 2017, Ms. Hubbard submitted an Academic Grievance to Dr. Achille Messac, Ph.D., Dean of the College of Engineering and Architecture.

22.    Receiving no response, Ms. Hubbard followed up with Dr. Messac on July 5, 2017. Dr. Messac responded that same day indicating that all official communications must be submitted through HU emails (Ms. Hubbard had been using her personal email account).

23.    On July 10, 2017, Ms. Hubbard resubmitted her Academic Grievance to Dr. Messac through HU email.

24.    On July 12, 2017, Ms. Hubbard then received a notice of academic suspension for failing to meet the 2.0 GPA requirement of the academic probation she was on before enrolling in FM II.

25.    On July 28, 2017, Ms. Hubbard met with Dr. Yilmaz who indicated that since Dr. Hammonds was off for summer break and technically not working he was not required to respond to Dr. Yilmaz's emails so Dr. Yilmaz could not move forward with the grade dispute until Dr. Hammonds returned from summer break.

///

26.     On August 15, 2017, Ms. Hubbard submitted an appeal for reinstatement citing the pending grade dispute with Dr. Hammonds because, if successful, she could meet the 2.0 GPA minimum to continue attending HU on probation.

27.     On August 17, 2017, Dr. Yilmaz denied Ms. Hubbard's appeal for reinstatement citing academic performance even though the grade dispute was still pending due to Dr. Hammonds being out on summer break.

28.     On August 30, 2017, Ms. Hubbard's parents advised HU's President and Provost of the situation.  That same day, the HU Provost indicated to Ms. Hubbard's parents that the Family Educational Rights and Privacy Act (hereinafter, "FERPA") prohibited him from discussing student issues with parents but was asking Associate Provost, Dr. Angela Cole Dixon, to look into the issue.

29.     On August 31, 2017, Dr. Cole Dixon met with Ms. Hubbard to inform her that her informal grievance was never initiated in the first place because she had not followed procedure. Dr. Cole Dixon erroneously indicated that HU policy required Ms. Hubbard to have a face-to-face meeting with a professor regarding a grade dispute even though HU policy does not actually include that provision whatsoever.

30.     On September 1, 2017, Dr. Yilmaz emailed Ms. Hubbard to advise he was upholding his decision of academic suspension stating that Ms. Hubbard had not formally initiated a formal grievance and that she would not reach the 2.0 GPA threshold required to bring her into good standing even if the outcome of the grievance was favorable to her.  Nonetheless, a successful grade dispute would have at least given her the minimum 2.0 GPA for the spring 2017 *semester*, thus allowing her to continue attending HU on probationary status.

///

///

31.     On September 15, 2017, Dr. Hammonds resigned from HU thereby precluding any face-to-face meeting with Ms. Hubbard or HU officials regarding Ms. Hubbards' grievance and grade dispute.

32.     As a result of Defendant's arbitrary, capricious, and unlawful actions, Ms. Hubbard has been prevented from completing her degree at HU.

## FIRST CAUSE OF ACTION

### *BREACH OF CONTRACT*

33.     Ms. Hubbard reincorporates by this reference each and every preceding paragraph as if fully restated herein.

34.     By admitting Ms. Hubbard and accepting her tuition payments, HU has an express and implied contract with Ms. Hubbard in connection with rights explicitly guaranteed by HU pursuant to the *Howard University Division of Student Affairs Handbook* (hereinafter, "HU Handbook") and also the *Howard University Academic Grievance Procedures* (hereinafter, "HU Grievance Procedures").

35.     Defendant's actions constitute a material and substantial breach of the express and implied contract by:

(a)     denying Ms. Hubbard her right to initiate a grade dispute pursuant to the official policy set forth in the HU Grievance Procedures;

(b)     requiring Ms. Hubbard to have a face-to-face meeting with Dr. Hammonds to initiate a grade dispute even though such a requirement is not actually outlined in the HU Grievance Procedures and such a meeting would have been impossible since Dr. Hammonds initially was out on summer break and not responsive to emails and later resigned his employment with HU;

(c)     denying Ms. Hubbard's academic suspension appeal while her grade dispute was left unresolved due to HU administrators failing to adhere to HU Grievance Procedures; and

(d)     failing to ensure that Dr. Hammonds provided adequate instruction and materials during the FM II class to ensure that Ms. Hubbard and other students knew what kind of graphs he wanted to see on the mid-term examination.

36.     At all times relevant herein, Ms. Hubbard abided and governed her conduct by the terms of the aforementioned contract, including meeting all of her financial obligations to HU.

37.     As a direct and proximate result of Defendant's actions, Ms. Hubbard has lost the difference in value over a lifetime of earnings expected to be earned by an individual who graduated with a bachelor's degree from HU and a person without a bachelor's degree from HU.

38.     As a direct and proximate result of Defendant's actions, Ms. Hubbard has lost several years, or more, of her career, tuition paid to HU, and living expenses.

39.     As a result of the breach Defendant committed against Ms. Hubbard, she has suffered and continues to suffer loss, damage and detriment including, without limitation, incidental and consequential damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

40.     It has been necessary for Ms. Hubbard to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

## SECOND CAUSE OF ACTION

### *BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING*

41.     Ms. Hubbard reincorporates by this reference each and every preceding paragraph as if fully restated herein.

42.     The aforementioned contract between Defendant and Ms. Hubbard contained an implied covenant of good faith and fair dealing, which precludes the Defendant from evading the spirit of the contract, willfully rendering imperfect performance, refraining from interference with Ms. Hubbard's ability to benefit from its terms, acting in contravention of Ms. Hubbard's reasonable expectations, failing to abide by the standards and policies promulgated by the Defendant, or otherwise acting in an arbitrary and capricious manner with respect to Ms. Hubbard.

43.     Defendant breached this implied covenant of good faith and fair dealing by making it impossible for Ms. Hubbard to realize the benefit of her contract and by permitting its agents to act in bad faith and in a manner that interfered with Ms. Hubbard's contractual expectations.

44.     As a result of the breach Defendant committed against Ms. Hubbard, she has suffered and continues to suffer loss, damage and detriment including, without limitation, incidental and consequential damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

45.     It has been necessary for the Ms. Hubbard to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

**WHEREFORE,** Ms. Hubbard prays that this Honorable Court enter judgment in Ms. Hubbard's favor, and against Defendant, for (1) an injunction requiring HU to reinstate Ms. Hubbard into her prior program; (2) compensatory damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00); (3) the costs and disbursements of this action, for interest, and such other attorney's fees that justice so requires; and (4) such other and further relief that justice so requires.

///

///

## JURY DEMAND

Plaintiff ELYSSA HUBBARD respectfully prays for a trial by jury on all issues so triable.

DATED this 31st day of October, 2017.

        _/s/ Tracy D. Rezvani_____
Tracy D. Rezvani
D.C. Bar No. 464293/ DDC# MD13281
**THE REZVANI LAW FIRM, LLC**
199 East Montgomery Avenue, Suite 100
Rockville, Maryland 20850
Telephone:  (202) 350-4270 x 101
Facsimile:  (202) 351-0544
Email:  tracy@rezvanilaw.com

Jason J. Bach, Esq.
**THE BACH LAW FIRM, LLC**
D.C. Bar No. 974126
7881 West Charleston Boulevard, Suite 165
Las Vegas, Nevada 89117
Telephone:  (702) 925-8787
Facsimile:  (702) 925-8788
Email:  jbach@bachlawfirm.com

## **VERIFICATION**

As to those allegations of fact not qualified by the phrase "upon information and belief" or otherwise, I do solemnly declare and affirm under penalties of perjury that the contents of the foregoing Complaint are true and accurate to the best of my knowledge.

Elyssa Hubbard

Dated this _31_ day of _Octobe_ , 2017