# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| ELYSSA HUBBARD, <br><br> *Plaintiff*, <br><br> v. <br><br> HOWARD UNIVERSITY, <br><br> *Defendant.* | Civil Action No. 17-2262 (RDM) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Elyssa Hubbard brings this action for breach of contract and breach of the covenant of good faith and fair dealing against Defendant Howard University ("Howard"), alleging that the university failed to provide adequate instruction and materials for a course she took; denied "her right to initiate" and to pursue "a grade dispute pursuant to" established grievance procedures; and deprived her of a meaningful opportunity to challenge her academic suspension, Dkt. 1 at 7–8 (Compl. ¶ 35). The matter is now before the Court on Howard's motion to dismiss for failure to state a claim. Dkt. 5. For the following reasons, the Court will **DENY** that motion.

## I. BACKGROUND

For purposes of Howard's motion to dismiss, the Court must "accept as true" the following factual allegations taken from Hubbard's complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Plaintiff Elyssa Hubbard was, until recently, enrolled as a student at Howard University in the mechanical engineering program. Dkt. 1 at 1 (Compl. ¶¶ 1–2). Some time prior to the Spring 2017 semester, Hubbard was placed on academic probation, and, as a result, was required

to earn a "minimum 2.0 GPA" to avoid suspension and "to continue attending" Howard. *Id.* at 5–6 (Compl. ¶¶ 24, 30). Hubbard, however, did not achieve that goal, due—at least in part—to a "D" grade she received in Fluid Mechanics II. Dkt. 1 at 3 (Compl. ¶ 11).

Hubbard contends that her grade in that course was unjustified for two reasons. First, she alleges that the grade that she received on her mid-term examination was unfair. *See id.* at 4 (Compl. ¶ 15). In particular, she alleges that when she asked Dr. James Hammonds, who taught the course, about her grade, he "initially stated that [she] did not provide graphs on the exam, but, when she pointed out that she had provided graphs, he then said" that the graphs she provided "were not what he wanted." *Id.* (Compl. ¶ 15). Hubbard adds, moreover, that Dr. Hammonds never provided the class with any "examples of what type of graphs he wanted and there was no textbook for the class." *Id.* (Compl. ¶ 15). Second, Hubbard alleges that Dr. Hammonds mistakenly concluded that she "did not turn in any assignments." *Id.* at 3–4 (Compl. ¶ 13). According to Hubbard, she, in fact, "completed all homework assignments" for the class and "had evidence [that] she submitted them to Professor Hammonds" by email. *Id.* at 4 (Compl. ¶ 14).

Consistent with Howard's grievance policy, Hubbard contacted Dr. Hammonds to dispute the grade. *Id.* at 3 (Compl. ¶ 12). Dissatisfied with Dr. Hammonds's response, she then contacted the Department Chair, Dr. Nadir Yilmaz. *Id.* at 4 (Compl. ¶ 14). Dr. Yilmaz reviewed Hubbard's exams and homework, but, because he did not receive a response from Dr. Hammonds, Dr. Yilmaz "recommended [that Hubbard simply] file a grievance with the appropriate [university] entity." *Id.* at 5 (Compl. ¶¶ 16–19). Hubbard then "submitted an [a]cademic [g]rievance" to the Dean of the College of Engineering and Architecture, Dr. Achille Messac. *Id.* (Compl. ¶ 21). "Receiving no response, . . . Hubbard followed up with Dr.

Messac," who told her that "all official communications must be submitted through [Howard University] emails." *Id.* (Compl. ¶ 22). Hubbard had initially filed her grievance "using her personal email account," and she therefore "resubmitted" the grievance to Dr. Messac using her Howard University email account. *Id.* (Compl. ¶¶ 22–23). Two days later, however, she "received a notice of academic suspension for failing to meet the 2.0 GPA requirement" while on academic probation. *Id.* (Compl. ¶ 24).

After receiving notice of her academic suspension, Hubbard met with Dr. Yilmaz, who told her that because Dr. Hammonds was off for the summer and "was not required to respond to Dr. Yilmaz's emails," "Dr. Yilmaz could not move forward with the grade dispute until Dr. Hammonds returned from summer break." *Id.* (Compl. ¶ 25). Hubbard then "submitted an appeal for reinstatement citing [her] pending grade dispute," which, "if successful," would have allowed her to "meet the 2.0 GPA minimum to continue attending [Howard] on probation." *Id.* at 6 (Compl. ¶ 26). Dr. Yilmaz, however, denied Hubbard's "appeal for reinstatement" without resolving the pending grade dispute. *Id.* (Compl. ¶ 27). Subsequently, the university's Associate Provost, Dr. Angela Cole Dixon, met with Hubbard and informed "her that her informal grievance was never initiated in the first place because she had not followed" the proper procedure; in particular, she had not had "a face-to-face meeting with a professor regarding [the] grade dispute." *Id.* (Compl. ¶ 29). According to Hubbard, no such requirement exists. *Id.*

Finally, "[o]n September 1, 2017, Dr. Yilmaz emailed . . . Hubbard," stating that "he was upholding his decision of academic suspension" because "Hubbard had not formally initiated [the] grievance [process]" and, "even if the outcome of the grievance was favorable to her," "she would not reach the 2.0 GPA threshold required to bring her into good standing." *Id.* (Compl.

3

¶ 30). Hubbard disagrees, alleging that she properly initiated the grievance process and that "a successful grade dispute would have at least given her the minimum 2.0 GPA for the spring 2017 *semester*, thus allowing her to continue attending [Howard] on probationary status." *Id.* (Compl. ¶ 30) (emphasis in original).

Hubbard then brought this diversity action for breach of contract and breach of the covenant of good faith and fair dealing, seeking reinstatement, damages, costs, and attorney's fees. *Id.* at 7–9 (Compl. ¶¶ 35–45).

## II. ANALYSIS

Hubbard's claims fall into two general categories: First, she alleges that "Dr. Hammonds [failed to] provide[] adequate instruction and materials during the [Fluid Mechanics] II class to ensure that [she] and other students knew what kind of graphs he wanted to see on the mid-term examination." *Id.* at 8 (Compl. ¶ 35). Second, she alleges that Howard failed to provide her with the contractually required process for resolving her grade dispute and challenging her suspension. *Id.* at 7–8 (Compl. ¶ 35). The Court will consider these claims in turn.

### A. Inadequate Instruction

With respect to the first category, Hubbard alleges that her Fluid Mechanics II instructor failed to "provid[e] adequate instruction and materials," *id.* at 8 (Compl. ¶ 35), such as "lectures," "handouts," or a "textbook for the class," *id.* at 4 (Compl. ¶ 15), "to ensure that . . . Hubbard and other students knew what kind of graphs he wanted to see on the mid-term examination," *id.* at 8 (Compl. ¶ 35). Howard moves to dismiss this claim on the ground that academic decisions "usually call for judicial deference," and Hubbard "does not plead any improper motivation or irrational action." Dkt. 5-2 at 9, 11. Although Howard's argument carries considerable force, as explained below, it is more appropriately raised at the summary judgment stage.

4

Under D.C. law, "the relationship between a university and its students is contractual in nature." *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017) (citations and internal quotation marks omitted). The relevant "contractual duties," moreover, can at least at times be found in "[u]niversity handbooks, codes, and other policies," *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 184 (D.D.C. 2016), and, for present purposes, the parties do not dispute that Howard's Student Affairs Handbook established enforceable rights. Those rights, however, must be viewed through the prism of academic freedom. "Only the most compelling evidence of arbitrary or capricious conduct," for example, "would warrant interference with the performance evaluation (grades) of a . . . student made by his teachers." *Jung v. George Washington Univ.*, 875 A.2d 95, 108 (D.C. 2005) (quoting *Greenhill v. Bailey*, 519 F.2d 5, 10 n.12 (8th Cir. 1975)); *see also Bain v. Howard Univ.*, 968 F. Supp. 2d 294, 298 (D.D.C. 2013). More generally, although students are entitled to "vindicat[e] the[ir] contractual rights," "courts should not invade [academic judgment], and only rarely assume academic oversight, except with the greatest caution and restraint." *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (citations and internal quotation marks omitted). The Court assumes for present purposes that this principle extends to complaints that students may have about the quality of their classroom instruction.

To state a claim for breach of contract, a plaintiff must allege: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 94 (D.D.C. 2010) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). Similarly, to state a claim for breach of the implied covenant of good faith and fair dealing, "a plaintiff must allege either bad faith or conduct that is arbitrary and capricious" and at odds with

"an agreed common purpose and [inconsistent] with the justified expectations of the other party." *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013). Bad faith, moreover, "requires more than mere negligence," and, in the university setting, courts must ensure that "the implied covenant of good faith and fair dealing" does not sweep "so broadly that courts end up 'substitut[ing their] judgment improperly for the academic judgment of the school.'" *Id.* at 754–55 (citation omitted).

Measured against these standards, Hubbard's inadequate-instruction claim undoubtedly faces an uphill battle. The Court cannot conclude, however, that it fails as a matter of law at this early stage of the litigation. In essence, Hubbard claims that she contracted with Howard to receive an education in mechanical engineering and that she has been denied the benefit of that bargain, not due to her own failings, but due to Dr. Hammonds's unreasonable conduct. In evaluating that claim, the Court will need to proceed with caution and will need to avoid substituting its judgment "for the academic judgment of the school." *Id*. Hubbard, moreover, will need to show more than mere negligence; she will need to demonstrate that Dr. Hammonds or the university acted in "bad faith" or in a manner that was "arbitrary and capricious." *Id.* at 754. Although that is a tall order, Hubbard has pled sufficient facts to overcome Howard's motion to dismiss.

Accepting the allegations of the complaint as true, the Court must assume the following: Dr. Hammonds initially gave Hubbard a "D" on her midterm because she did not provide any graphs; when she pointed out that she *did* provide graphs, he changed his rationale, explaining instead that the graphs "were not what he wanted;" Dr. Hammonds never instructed his class about the relevant graphs and did not assign a textbook or provide handouts identifying the type of graphs "he wanted;" but, in the absence of such direction, "Hubbard found examples of graphs

6

that were similar to or the same reference materials . . . used by others in her study group." Dkt. 1 at 4 (Compl. ¶ 15). Other allegations in the complaint, moreover, suggest that Dr. Hammonds may have harbored some ill-will toward Hubbard. She alleges, for example, that she received an "F" from Dr. Hammonds on a lab assignment in Fluid Mechanics I, even though her lab partner received a "B" grade for "their joint work assignment," and she alleges that Dr. Hammonds repeatedly failed to give her credit for homework assignments that she completed and turned in. *Id.* at 2–4 (Compl. ¶¶ 8–9, 13–14). Taken together, her allegations tell a story that, if accepted as true, is sufficient to "allow[] the court to draw the reasonable inference that" Dr. Hammonds either acted in bad faith or in a wholly capricious manner. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

The Court will, accordingly, deny Howard's motion to dismiss Hubbard's inadequate-instruction claims.

**B.     Inadequate Process**

Hubbard also alleges that she properly initiated a grievance disputing her grade by contacting her instructor, the Department Chair, and the Dean, Dkt. 1 at 3–5 (Compl. ¶¶ 12–23); that, contrary to its policies, Howard denied her the right to initiate and to pursue that grade dispute; and that, as a result, Howard improperly "den[ied] [her] academic suspension appeal while her grade dispute was left unresolved," *id.* at 7–8 (Compl. ¶ 35). These allegations plausibly state a claim that Howard breached the contractual duties forth in its Student Handbook. The Handbook states, for example, that (1) a student "who believes they have been aggrieved" may initiate the "informal" grievance process by first "seek[ing] an informal resolution . . . with [the] instructor;" (2) if the dispute is not resolved, "the student is advised to seek the intervention of their department chairperson;" and (3) if there is still no resolution, "disputes . . . are then brought to the Dean's Office" and the Dean "will seek to reach an informal

resolution through mediation between the parties." Dkt. 5-3 at 6. Hubbard's complaint plausibly alleges that she initiated and pursued this process, but that Howard failed to resolve the dispute pursuant to the policy. *See Bain*, 968 F. Supp. 2d at 299 ("[A] school's failure to comply with published policies can be evidence of arbitrariness.").

Howard disagrees, arguing that Hubbard's "D" in Fluid Dynamics II was deserved, Dkt. 5-2 at 5–6; that she "abandoned" her "grievance," *id.* at 12; that she failed to appeal her suspension and thus "accepted [it]," *id.* at 12; and that, even had Hubbard's grade dispute been successful, she still would have been suspended for another failing grade that semester, *id.* at 13. To support these assertions, Howard points to Hubbard's correspondence with school officials and to her academic record, which it attaches to its motion. *See* Dkt. 5-3 at 11–24.

Once again, Howard's arguments are better suited to a motion for summary judgment than a motion to dismiss. At this stage of the proceeding, the Court must construe the complaint in the light most favorable to the plaintiff, *see Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17, 20 n.8 (D.C. Cir. 2008), and may not consider "matters outside the pleadings," Fed. R. Civ. P. 12(d), except for "documents either attached to or incorporated in the complaint," *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997). Under that standard, Howard's Student Handbook is at least arguably incorporated into the complaint. But Howard goes too far in arguing that the Court should evaluate Hubbard's claims in light of other exhibits, including her academic transcript and various correspondence that it attaches to its motion to dismiss. Howard is welcome to file a motion for summary judgment placing those materials, and any supporting declarations, before the Court. Hubbard, in turn, is welcome to respond to any such

motion with her own evidence.  But that is the stuff of summary judgment (or trial) and not a motion to dismiss.

The Court will, accordingly, deny Howard's motion to dismiss Hubbard's inadequate-process claims.

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss, Dkt. 5, is hereby **DENIED**.

**SO ORDERED**.


    /s/ Randolph D. Moss
    RANDOLPH D. MOSS
    United States District Judge

Date:  September 21, 2018